JOURNAL ENTRY AND OPINION.
{¶ 1} Defendant-appellant, Kevin Harris, appeals his conviction for rape and gross sexual imposition following a bench trial for these offenses. For the reasons that follow, we affirm.
 {¶ 2} In December 2000, the victim and her siblings were under the guardianship of their aunt, who had brought the children over to the home of the victim's mother for their weekend visitation. It appears from the record that the mother did not have custody of the victim or her siblings because the mother had recently been released from prison after serving a sentence for welfare fraud in California. Appellant, who was the boyfriend of the victim's mother, and his three-year old daughter were likewise visiting the home of the victim's mother. The victim was 11 years old at this time.
 {¶ 3} As evening approached, the victim and her siblings, as well as the mother, appellant and the latter's three-year-old child, all went to sleep in one room. According to the victim's testimony, the three-year-old child was sleeping in between appellant and the victim on the floor when, sometime during the night, appellant reached over the child and fondled the victim's breasts and later inserted his finger in her vagina. The victim testified that she awoke and appellant then got up to go to the bathroom. The victim's mother was awake by then and observed appellant "sweating" after returning from the bathroom. The victim testified that she then got up and went to sleep on the bed without saying anything to anyone. The next day, everyone awoke, had breakfast and went home.
 {¶ 4} The victim did not tell her mother what had happened until approximately one week later when the victim, again, went to visit her mother. The victim's aunt testified that the victim was very apprehensive about entering her mother's home when she heard appellant's voice from within. Appellant soon left and the victim then relayed the events that had occurred one week earlier. The mother, although angered and shocked, asked the victim not to say anything to anyone for fear that it would interfere with the mother's ability to regain custody of her children, which was due to occur in February 2001. The mother said that she would handle the situation.
 {¶ 5} The victim's mother testified that she confronted appellant and he denied the incident ever occurred. She, nonetheless, continued to see appellant, although he had no further contact with her children. The aunt, who was unaware of the allegations, testified that, around this time, the victim began acting out and fighting with her siblings more than before.
 {¶ 6} Feigning the need for medical attention, the aunt took the victim to pediatrician Karen Vargo, M.D., for a medical examination on January 16, 2001. The victim testified that she then described the incident involving appellant. Dr. Vargo testified that the victim's physical examination was unremarkable and she referred her to the Alpha Clinic at MetroHealth Medical Center for further gynecological examination as well as for counseling. She also contacted the Cuyahoga County Department of Children and Family Services ("CCDCFS").
 {¶ 7} Bonnie Buden, an investigator in the intake department of CCDCFS, testified that she interviewed the victim. The victim again described the incident with appellant but her description of the sleeping arrangements had her mother sleeping on the bed and the victim getting up to go the bathroom. Ms. Budin similarly referred the victim to the Alpha Clinic and had no further contact with the victim.
 {¶ 8} At the Alpha Clinic, the victim was seen by pediatrician David Bar-Shain, M.D. He noted that she was a sixth-grade student in special classes for learning disabled children and that she exhibited oppositional behavior prior to disclosure. He further noted that, previous to this incident, the victim cut her lip with scissors "to prove that it didn't hurt" and also slit her throat with a knife although she didn't remember when or why she did it. The physical examination was otherwise normal, a finding that is not unusual with digital penetration, according to Dr. Bar-Shain's testimony. Based on her history, physical examination and the fact that she had given "spontaneous, clear consistent and detailed description of being abused," he concluded that the victim was "probably abused."
 {¶ 9} The counselor, Cheryl Kim, a licensed social worker, testified that she began counseling the victim in March 2001. She further testified that she had concluded that the victim's symptoms were consistent with post-traumatic stress disorder and treated her accordingly.
 {¶ 10} Appellant was eventually indicted for one count each of rape and gross sexual imposition, in violation of R.C. 2907.02 and 2907.05, respectively. Appellant waived a trial before a jury and the case was tried to the bench.
 {¶ 11} Testifying on appellant's behalf was Jacqueline Warren, Ph.D., a psychologist in private practice in Beachwood, Ohio. Dr. Warren testified that she reviewed the medical and educational records in this case. Relying on these records and, in particular, the report of Dorothy Dickens, a social worker affiliated with the Alpha Clinic,[1] she opined that the victim's version of events is questionable given her history of embellishing or exaggerating events in order to seek attention. She conceded, however, that she did not interview nor otherwise evaluate the victim.
 {¶ 12} Appellant testified on his own behalf. His version of the events on the night in question was quite different than that of the victim's. He testified that the victim slept next to her mother, who slept next to him. Appellant's three-year-old child slept on the other side of him. He further testified that he did not get up to go the bathroom at any time during the night and that he slept through the night. Appellant vehemently denied that the events of that evening occurred as the victim reported them.
 {¶ 13} The trial court eventually found appellant guilty of both offenses. The trial court, however, did not find that the state proved beyond a reasonable doubt that appellant "purposely compell[ed] [the victim] to submit by use of force or threat of force," the penalty enhancement provision of the rape offense. He was, nonetheless, sentenced to concurrent terms of six years and one year, for rape and gross sexual imposition, respectively.
 {¶ 14} Appellant is now before this court and in his sole assignment of error contends that his conviction is against the manifest weight of the evidence.
 {¶ 15} A manifest-weight-of-the-evidence argument involves determining whether there exists a greater amount of credible evidence to support one side of an issue rather than the other. State v. Thompkins
(1997), 78 Ohio St.3d 380, 387. It is not a question of mathematics, but depends on its effect in inducing belief. Id. A reviewing court weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the factfinder clearly lost his or her way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Martin (1983), 20 Ohio App.3d 172, 175. A new trial is warranted only in the exceptional case where the evidence weighs heavily against conviction. Id.
 {¶ 16} This is not the exceptional case. It was appellant's position that the victim's history of "embellish[ing] her stories" and engaging in self-injurious behavior such as cutting her lips with scissors and putting a knife to her throat was indicative of her lack of credibility as a witness. He, therefore, posited that inconsistencies in the testimony as to the sleeping arrangements, inter alia, could be equally indicative of less than credible testimony regarding the allegations of rape and gross sexual imposition against him.
 {¶ 17} To be sure, the trial court acknowledged the conflict in testimony as it pertained to the sleeping arrangements on the evening in question. Finding this testimony conflicting, however, did not require the trial court to conclude that the remaining testimony was any less credible. It is within the purview of the factfinder to believe all or part of any testimony the factfinder hears. We cannot say that the trial court lost its way in resolving this conflicting testimony so as to create a manifest miscarriage of justice. In analyzing the inconsistencies in the testimony, the trial judge stated:
 {¶ 18} "Based on all the evidence here, I think that if we had only [the victim's] testimony as to what happened, * * * I would agree with [Defense Counsel], but her testimony was consistent with changes in her behavior that were noted and with the circumstances of this — details of this coming out over a period of several weeks or even months. I find that testimony to be credible.
 {¶ 19} "I understand there were inconsistencies as to who was where in the bedroom, but we must keep in mind that this — what happened that night was something that probably nobody in the room even thought much about at the time except for [the victim]. Where the television was, where the people were, I — I think two years or a year and a half after the fact, it's something people could be inconsistent about."
 {¶ 20} Relying on not only the testimony of the victim, but those with whom she interacted on a day-to-day basis, the trial court was able to reconcile this conflicting testimony with its conclusion finding appellant guilty of the offenses for which he was charged. Consequently, we see no manifest miscarriage of justice.
Judgment affirmed.
MICHAEL J. CORRIGAN, P.J., AND ANTHONY O. CALABRESE, JR., J., CONCUR
[1] In the history section of her report, Ms. Dickens stated that the victim "also has a history of running away from home, suicidal gestures, embellishes her stories and struggles with adults including her teachers."